UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| STATES SELF-INSURERS RISK RETENTION GROUP, INC.,<br><br>              Plaintiff/Counter-Defendant,<br><br>              vs.<br><br>CITY OF WAUKEGAN; ADRENE YANCEY, Administrator of the Estate of ARTIS YANCEY, deceased; Special Representative for LUIS MARQUEZ, deceased; Special Representative for JOHN MORAN, deceased; EDWARD DENNIS; and ANGEL GONZALEZ,<br><br>              Defendants/Counter-Plaintiffs. | 17 C 1028<br><br>Judge Gary Feinerman |

<u>**MEMORANDUM OPINION AND ORDER**</u>

In 1994, City of Waukegan police officers arrested Angel Gonzalez for rape and kidnapping, and in 1995 he was convicted and imprisoned. More than twenty years later, after DNA evidence exonerated him, Gonzalez sued Waukegan and several officers involved in his arrest and prosecution (collectively, unless context requires otherwise, "Waukegan") under 42 U.S.C. § 1983 and Illinois law. Waukegan tendered the case to one of its insurers, States Self-Insurers Risk Retention Group, and States brought the present coverage suit under the diversity jurisdiction against Waukegan and Gonzalez—who, as the plaintiff in the underlying suit, is a necessary party, *see Great W. Cas. Co. v. Mayorga*, 342 F.3d 816, 817 (7th Cir. 2003); *M.F.A. Mut. Ins. Co. v. Cheek*, 363 N.E.2d 809, 811 (Ill. 1977)—seeking a declaration of non-coverage. Doc. 11. Waukegan and Gonzalez counterclaimed separately, seeking a declaration of coverage. Docs. 25, 35.

Waukegan and States have cross-moved for judgment on the pleadings under Federal Rule of Civil Procedure 12(c). Docs. 49, 52. Gonzalez has not moved for judgment, but did file an opposition to States's motion. Doc. 59. States's motion is granted and Waukegan's motion is denied.

## Background

As on a Rule 12(b)(6) motion, the court on a Rule 12(c) motion assumes the truth of the operative complaint's well-pleaded factual allegations, though not its legal conclusions. *See Zahn v. N. Am. Power & Gas, LLC*, 815 F.3d 1082, 1087 (7th Cir. 2016); *Adams v. City of Indianapolis*, 742 F.3d 720, 727-28 (7th Cir. 2014); *Pisciotta v. Old Nat'l Bancorp*, 499 F.3d 629, 633 (7th Cir. 2007). The court must also consider "documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice," along with additional facts set forth in the parties' briefs opposing judgment, so long as those additional facts "are consistent with the pleadings." *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1020 (7th Cir. 2013); *see also N. Ind. Gun & Outdoor Shows, Inc. v. City of South Bend*, 163 F.3d 449, 452 (7th Cir. 1998). In setting forth the facts at the pleading stage, the court does not vouch for their accuracy. *See Jay E. Hayden Found. v. First Neighbor Bank, N.A.*, 610 F.3d 382, 384 (7th Cir. 2010). That said, the pertinent facts are undisputed.

### A.    The *Gonzalez* Lawsuit

Waukegan police officers arrested Gonzalez in July 1994 and later caused him to be charged with aggravated sexual assault and aggravated kidnapping. Doc. 11-1 at ¶ 2; Doc. 25 at p. 5, ¶ 14; Doc. 33 at p. 4, ¶ 14; Doc. 35 at ¶ 17. He was convicted in 1995 and sentenced to 55 years' imprisonment. Doc. 11-1 at ¶ 4; Doc. 25 at p. 5, ¶ 14; Doc. 33 at p. 4, ¶ 14; Doc. 35 at

¶ 19.  Gonzalez moved for post-conviction DNA testing of the available physical evidence, which ultimately showed that his genetic profile did not match the perpetrator's.  Doc. 11-1 at ¶¶ 5, 78-80; Doc. 25 at p. 6, ¶¶ 15-16; Doc. 33 at p. 5, ¶¶ 15-16.  His conviction was vacated in March 2015, and a certificate of innocence issued months later.  Doc. 11-1 at ¶¶ 5-7, 81-83; Doc. 25 at p. 6, ¶¶ 15-16; Doc. 33 at p. 5, ¶¶ 15-16; Doc. 35 at ¶ 21.

Gonzalez then sued the City of Waukegan and several Waukegan police officers in federal court under federal and state law.  *Gonzalez v. City of Waukegan*, 16 C 2906 (N.D. Ill. filed Mar. 7, 2016) (complaint reproduced at Doc. 11-1); Doc. 25 at p. 5, ¶ 13; Doc. 33 at p. 4, ¶ 13; Doc. 35 at ¶ 16.  Gonzalez alleges that, pursuant to Waukegan's policies and practices and its failure to properly train its police, the officers fabricated incriminating evidence and withheld exculpatory evidence, fabricated and coerced false confessions, filed false police reports, and committed perjury, resulting in his wrongful conviction and imprisonment.  Doc. 11-1; Doc. 25 at pp. 5-8, ¶¶ 13, 18-21; Doc. 33 at pp. 4-8, ¶¶ 13, 18-21; Doc. 35 at ¶¶ 16, 22-23.

### B.       The States Policy

Waukegan notified States of the *Gonzalez* suit in April 2016, seeking coverage under its Public Entity Excess Liability Insurance Policy, which was in place from July 1, 2015 to July 1, 2016 (the "States Policy").  Doc. 11-4 at 4; Doc. 25 at pp. 9-13, ¶¶ 24, 34-35; Doc. 33 at pp. 9-13, ¶¶ 24, 34-35; Doc. 35 at ¶¶ 25, 32-33, 83.  The policy became effective on November 1, 2013, and was renewed on the same terms on November 1, 2014, and again on July 1, 2015.  Doc. 11-2 at 4; Doc. 11-3 at 4; Doc. 11-4 at 4.  The policy is an occurrence policy, which means that Waukegan was insured against covered events that took place during the coverage period regardless of when it made claims for coverage.  Doc. 25 at p. 10, ¶ 26; Doc. 33 at pp. 9-10, ¶ 26; Doc. 35 at ¶ 26; *see Truck Ins. Exch. v. Ashland Oil, Inc.*, 951 F.2d 787, 790 (7th Cir. 1992)

("Whereas an *occurrence* policy protects the insured against the financial consequences of an accident or other liability-creating event that occurs during the policy period, no matter when the claim is made—it might be many years later—a *claims-made* policy protects the insured against the financial consequences of a legal claim asserted against him during the policy period.").

The States Policy includes a "Public Entity Liability Insuring Agreement" and a "Public Entity Management Practices Liability Insuring Agreement." Doc. 11-2 at 8-9. The Public Entity Liability Insuring Agreement, set forth in Section I.A of the policy, provides:

## SECTION I – INSURING AGREEMENTS

### A. Public Entity Liability Insuring Agreement

1. States will pay *damages* the *insured* is legally obligated to pay that are the result of *bodily injury*, *property damage*, or *personal injury* if:

   a. the applicable self-insured retention has been exhausted by the actual payment of covered *damages* or *legal expenses* by or on behalf of the *named insured*; and

   b. the *bodily injury* or *property damage* is first sustained during the *policy period* in the *coverage territory* and results from an *occurrence*; or

   c. the *personal injury* is first committed during the *policy period* in the *coverage territory*. For the purposes of the coverage afforded for the offense of malicious prosecution, the *personal injury* will be deemed to have been committed at the time the prosecution was initiated.

*Id.* at 8. The Public Entity Management Practices Liability Insuring Agreement, set forth in Section I.B of the policy, provides:

### B. Public Entity Management Practices Liability Insuring Agreement

1. States will pay *damages* the *insured* is legally obligated to pay that are the result of a *wrongful act* if:

   a. the applicable self-insured retention has been exhausted by the actual payment of covered *damages* or *legal expenses* by or on behalf of the *named insured*; and

   b. the *wrongful act* is first committed during the *policy period* in the

4

*coverage territory.*

*Id*. at 8-9.

The States Policy defines the following italicized terms:

- "*Bodily injury* means physical injury, sickness or disease sustained by a person, including death," and further including "emotional distress and mental anguish that results from the physical injury, sickness or disease." *Id*. at 21.

- "*Claim* means a demand for *damages*. Claim also means a civil proceeding seeking *damages*, and includes: 1. an arbitration submitted to with States' consent; or 2. any other alternative dispute resolution proceeding in which covered *damages* are claimed and to which the *insured* submits with States' consent." *Id*. at 21-22.

- "*Damages* means … a monetary amount paid to compensate an individual or entity for an injury or loss covered by this policy" together with pre- and post-judgment interest and attorney fees. *Id*. at 22.

- "*Personal injury* means: 1. false arrest; 2. false imprisonment; 3. libel or slander; 4. invasion of privacy; 5. wrongful eviction; 6. malicious prosecution; 7. abuse of process; and 8. infringement of copyright, title or slogan in a *named insured's* advertisement." *Id*. at 25.

- "*Wrongful Act* means an act, error, omission or breach of duty arising out of the operations of a *named insured*." *Id*. at 27.

The parties agree that "bodily injury," "personal injury," and "wrongful act" encompass the acts alleged in *Gonzalez*, and that "named insured" and "insured" encompass Waukegan and the officer defendants in *Gonzalez*. Doc. 25 at p. 11, ¶¶ 27-29; Doc. 33 at pp. 10-11, ¶¶ 27-29; Doc. 35 at ¶¶ 27-29.

Significant here, the States Policy includes "nose" coverage, which extends coverage to acts committed during the twenty-two years prior to the policy's effective date of November 1, 2013. Doc. 25 at p. 12, ¶ 30; Doc. 33 at p. 11, ¶ 30. That time period includes 1994 and 1995, when the events alleged in *Gonzalez* took place. *Ibid*. The nose coverage's terms appear in the "Prior Acts Endorsement," which amends Section I.A.1.b. of the States Policy as follows:

5

Section I, A. 1. (b.) is deleted and replaced with the following:

    b.   the *bodily injury* or *property damage* is first sustained during the *policy period* in the *coverage territory* or; the *bodily injury* or *property damage* is first sustained in the *coverage territory* during 22 years prior to the inception date shown in the Declarations of this policy and;

        1.   the *named insured* had no knowledge at the inception of this policy of the *bodily injury* or *property damage* or could not have reasonably foreseen that the *bodily injury* or *property damage* might give rise to a *claim*;

        2.   there is no insurance or other indemnity agreement that applies, in whole or in part, to the *claim* arising from the *bodily injury* or *property damage*;

        3.   the policy providing coverage for *bodily injury* or *property damage* immediately preceding this policy was claims-made, not occurrence, coverage;

        4.   the *insured* had public entity general liability insurance in effect during the five years prior to the inception of this policy; and

        5.   no claim was made seeking *damages* for the *bodily injury* or *property damage* prior to the inception of this policy.

Doc. 11-2 at 33. The five enumerated conditions of nose coverage are henceforth referred to as the conditions precedent. The Prior Acts Endorsement makes an identical modification to Section I.A.1.c. of the policy, except that the term "bodily injury or property damage" is replaced with "personal injury," and the term "sustained" is replaced with "committed." *Id*. at 33-34. The Prior Acts Endorsement makes the same modification to Section I.B.1.b. of the policy, except that the term "bodily injury or property damage" is replaced with "wrongful act," the term "sustained" is again replaced with "committed," and the term "public entity general liability insurance" is replaced with "public entity management practices liability insurance." *Id*. at 34.

Shortly after Waukegan notified it of the *Gonzalez* suit, States sent Waukegan a letter denying coverage. Doc. 25 at p. 13, ¶¶ 34-35; Doc. 33 at pp. 12-13, ¶¶ 34-35; Doc. 35 at ¶¶ 32-33. States's letter asserted that Waukegan was covered for the acts alleged in *Gonzalez* under a

different insurance policy, issued by Certain Underwriters at Lloyd's and Northfield Insurance

Company, that was in effect when Gonzalez was arrested and charged in July 1994 (the "Lloyd's

Policy").  Doc. 35 at ¶¶ 12 n.2, 50 n.3, 70; *see also* Doc. 25 at p. 13, ¶ 36; Doc. 33 at p. 13, ¶ 36.

As a result, States concluded, Waukegan failed to satisfy the Prior Acts Endorsement's second

condition precedent for nose coverage—that "there is no insurance or other indemnity agreement

that applies, in whole or in part, to the *claim* arising from" the acts alleged in *Gonzalez*.  Doc. 35

at ¶ 59.  States added several other bases for denying coverage, but did not invoke the third

condition precedent for nose coverage.  Doc. 25 at pp. 15-17, ¶¶ 42-47; Doc. 33 at pp. 15-16,

¶¶ 42-47.

### C.     The Lloyd's Policy

The "Comprehensive General Liability" provision of the Lloyd's Policy, set forth in

Section II.A of the policy, states in pertinent part:

> Underwriters hereby agree, subject to the limitations, terms and conditions
> hereunder mentioned, to indemnify the Assured for all sums which the Assured
> shall be obligated to pay by reason of the liability imposed upon the Assured by
> law or assumed by the Assured under contract or agreement for damage direct
> or consequential, and expenses, all as more fully defined by the term 'ultimate
> net loss', on account of personal injuries, including death at any  time resulting
> therefrom, suffered or alleged to have been suffered by any person or persons
> (excepting employees of the Assured injured in the course of their
> employment) … happening during the period of this insurance except as
> covered under Section II B & C.

Doc. 48-1 at 19.  The "Law Enforcement Liability" provision, set forth in Section II.C, states in

pertinent part:

> Underwriters hereby agree, subject to the limitations, terms and conditions
> hereunder mentioned, to indemnify the Assured for all sums which the Assured
> shall be obligated to pay by reason of errors, omissions or negligent acts arising
> out of the performance of the Assured's duties while acting as a law
> enforcement official or officer in the regular course of public employment as
> hereinafter defined, arising out of any occurrence from any cause on account of
> Personal Injury, Bodily Injury, Property Damage happening during the period of
> the insurance except as covered under Section II A and B.

*Ibid*.  Both of these Section II provisions extend occurrence-based coverage.  *Ibid*.

The Lloyd's Policy defines the term "Personal Injury" to include "Bodily Injury, Mental Anguish, … Malicious Prosecution, [and] Discrimination," as well as, but only for purposes of the Law Enforcement Liability provision, "False Arrest, False Imprisonment, Detention and Violation of Civil Rights arising out of Law Enforcement activities."  *Ibid*.  The term "Bodily Injury" means "physical injury to any person … and any mental anguish or mental suffering associated with or arising from such physical injury."  *Id*. at 20.  The term "Named Assured" includes "[t]he City of Waukegan and all boards, departments, divisions, commissions, authorities and any other activities under the supervision or control of the City whether now or hereafter constituted."  *Id*. at 7.  The term "Assured" includes "not only the Named Assured but also … any official, trustee, Director, Officer, Partner, Volunteer or employee of the Named Assured while acting within the scope of his duties as such."  *Id*. at 11.

The Lloyd's Policy also contains a separate "Errors and Omissions" provision, set forth in Section IV, which states: "If during the Policy Period, any Claim is first made against the Assured for a Wrongful Act, [Lloyd's] will indemnify the Assured, for all Loss incurred by the Assured by reason of any Wrongful Act as hereinafter defined."  *Id*. at 26.  Unlike the Comprehensive General Liability and Law Enforcement Liability coverage provided in Section II, which is occurrence-based, the Errors and Omissions coverage provided in Section IV is claims-based.  *Ibid*.; *see Truck Ins. Exch.*, 951 F.3d at 790 (distinguishing claims-based coverage from occurrence-based coverage).  The policy defines the term "Wrongful Act" as "any actual or alleged error or mis-statement, omission, act of neglect or breach of duty including misfeasance, malfeasance, and non-feasance by the Assured."  Doc. 48-1 at 26.  Although the term "'Wrongful Act' includes actual or alleged violations of the United States Constitution … or any

law affording protection for civil rights," the Errors and Omissions provision does not apply to "any Claim made against the Assured … arising out of law enforcement activities" or to "any claim for damages … which is covered under any other Section of this Policy." *Id*. at 27.

Waukegan tendered the *Gonzalez* lawsuit to Lloyd's and Northfield under the Lloyd's Policy. Doc. 59-1 at 5, 12. Waukegan, on the one hand, and Lloyd's and Northfield, on the other, ultimately entered into materially identical "Risk Management Agreement[s]" in June 2017. *Id*. at 2, 4, 11. Each Agreement provides:

> [T]he Parties wish to resolve their present coverage disputes related to the *Gonzalez* Lawsuit by way of compromise and without waiver of or prejudice to their respective positions in respect of these or other current or future coverage disputes, but strictly as a means of avoiding the expense, time and uncertainty of coverage litigation and without regard to the merits of each other's claims, defenses or positions.

*Id*. at 5, 12.

Pursuant to the Agreements, Lloyd's and Northfield agreed to pay Waukegan $270,000 and $630,000, respectively, for a total of $900,000. *Id*. at 6, 13. Each insurer represented that those amounts comprised "the full limits of [its] liability" under the Lloyd's Policy. *Ibid*. In exchange, Waukegan agreed to release Lloyd's and Northfield from "any and all claims" against them, including "any demand, request or claim for past or future costs of defense, settlement or indemnity arising out of, related to or in connection with the *Gonzalez* Lawsuit." *Id*. at 6, 13.

### D.     The Indian Harbor Policy

Indian Harbor Insurance Company issued the policy (the "Indian Harbor Policy") that Waukegan had in place from November 1, 2012 to November 1, 2013, immediately prior to the States Policy's effective date. Doc. 35 at ¶ 52; Doc. 35-1 at 66-102. Like the States Policy, the Indian Harbor Policy provided occurrence-based "Law Enforcement Liability Coverage" for "all **damages** resulting from a **wrongful act(s)** which arise out of … law enforcement activities."

Doc. 35-1 at 68; *see also* Doc. 33 at p. 27; Doc. 35 at ¶ 52. For purposes of the Law Enforcement Liability Coverage, the Indian Harbor Policy defined the term "wrongful act" to "mean[] an actual or alleged error or omission, negligent act, neglect or breach of duty by an **insured** while conducting law enforcement activities, which result in: a. **personal injury**, or b. **bodily injury**, or c. **property damage**, caused by an **occurrence**." Doc. 35-1 at 72.

The Indian Harbor Policy separately provided claims-based coverage for a different category of wrongful act. Doc. 35-1 at 86, 96-97. Under the policy's "Public Officials and Public Employment Practices Liability Coverage," Waukegan was covered for "wrongful employment practice(s)," which included "employment related discrimination in connection with hiring, promotion, advancement or opportunity demotion, discipline, pay, or termination"; "sexual harassment, including unwelcome sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature"; and "any of the following employment related acts: misrepresentation, invasion of privacy, defamation, retaliation, negligent infliction of emotional distress, wrongful discipline, negligent evaluation, negligent hiring, or negligent supervision." *Ibid.*

## Discussion

The court resolves a Rule 12(c) motion under the same standard as a Rule 12(b)(6) motion. *See Guise v. BWM Mortg., LLC*, 377 F.3d 795, 798 (7th Cir. 2004). The parties agree that this suit is governed by Illinois law. Doc. 50 at 2; Doc. 53 at 7. The Seventh Circuit has summarized Illinois law governing the interpretation of insurance policies as follows:

> In Illinois, insurance policies are contracts; the general rules governing the interpretation and construction of contracts govern the interpretation and construction of insurance policies. Illinois courts aim to ascertain and give effect to the intention of the parties, as expressed in the policy language, so long as doing so does not contravene public policy. In doing so, they read the policy as a whole and consider the type of insurance purchased, the risks

> involved, and the overall purpose of the contract.  If the policy language is
> unambiguous, courts apply it as written.  Policy terms that limit an insurer's
> liability are liberally construed in favor of coverage, but only when they are
> ambiguous, or susceptible to more than one reasonable interpretation.

*Clarendon Nat'l Ins. Co. v. Medina*, 645 F.3d 928, 933 (7th Cir. 2011) (citations omitted).  "[A]

court will not search for ambiguity where there is none."  *Valley Forge Ins. Co. v. Swiderski*

*Elecs., Inc.*, 860 N.E.2d 307, 314 (Ill. 2006); *see also Native Am. Arts, Inc. v. Hartford Cas. Ins.*

*Co.*, 435 F.3d 729, 732 (7th Cir. 2006).

According to States, this case is simple.  States concedes that the *Gonzalez* suit is a

"claim" within the meaning of the States Policy for bodily injury (Gonzalez's pain and suffering,

mental anguish, and severe emotional distress), personal injury (malicious prosecution, false

arrest, false imprisonment, and detention), and wrongful acts (Waukegan's actions related to its

law enforcement efforts).  Doc. 53 at 8-9.  States argues, however, that pursuant to the Prior Acts

Endorsement's second condition precedent, *Gonzalez* falls within the scope of the States Policy's

nose coverage only if Waukegan has "no insurance or other indemnity agreement that applies" to

the suit.  *Ibid.*  And because the Lloyd's Policy applies to *Gonzalez*, States maintains, the second

condition precedent is not satisfied and there accordingly is no nose coverage.  *Ibid.*; Doc. 11 at

¶ 40 ("Because … the Lloyd's Policy applies 'in whole or in part' to the *Gonzalez* action, there is

no coverage for Waukegan under the States Policy's Prior Acts Endorsement.").

In response, Waukegan first argues that because certain of the Prior Acts Endorsement's

conditions precedent render illusory the States Policy, none of the conditions precedent may be

enforced to deny nose coverage.  In the alternative, assuming that the States Policy is not

illusory, Waukegan argues that it in fact has satisfied the second condition precedent, while

Gonzalez maintains that it cannot be determined on the pleadings whether that condition

precedent has been satisfied.  Those responses fail to persuade.

## I. The Prior Acts Endorsement's Conditions Precedent Do Not Render Illusory the States Policy.

Waukegan contends that because the Prior Acts Endorsement's third condition precedent can never be satisfied, the States Policy is worthless and illusory, which under Illinois law renders unenforceable all five conditions precedent. Doc. 50 at 9-10; Doc. 61 at 5-6. Waukegan's logic runs as follows. The third condition precedent provides that nose coverage under the States Policy applies only if "the policy providing coverage for [bodily injury, property damage, personal injury, or a wrongful act] immediately preceding this policy was claims-made, not occurrence, coverage." Doc. 11-2 at 33-34. However, the applicable coverage Waukegan had in place immediately prior to the States Policy—under the Indian Harbor Policy's Law Enforcement Liability Coverage provision—was occurrence-based, thus defeating the third condition precedent. Doc. 50 at 10. Consequently, Waukegan contends, applying and enforcing the third condition precedent "renders [the States Policy] substantially worthless and inherently illusory," as "there is no scenario possible under which Waukegan could ever be covered for any law enforcement related claim of bodily injury, property damage or personal injury because it would always be barred under Condition 3." *Ibid.* In turn, because the five conditions precedent "serve as an integrally dependent unit," invalidating the third condition precedent because it can never be satisfied invalidates them all. *Id.* at 11. And once the conditions precedent are invalidated, Waukegan contends, Gonzalez's malicious prosecution claim is covered under Section I.A.1.c. of the Prior Acts Endorsement because, under that provision, the personal injury he alleges (malicious prosecution) is "deemed to have been committed at the time the prosecution was initiated"—in this case, July 1994, which falls within the nose provision's twenty-two year coverage period. *Ibid.*

The pertinent legal principles are as follows. Under Illinois law, "[a]n illusory promise appears to be a promise, but on closer examination reveals that the promisor has not promised to do anything. … An illusory promise is also defined as one in which the performance is optional." *Regensburger v. China Adoption Consultants, Ltd.*, 138 F.3d 1201, 1206-07 (7th Cir. 1998) (quoting *W.E. Erickson Constr., Inc. v. Chi. Title Ins. Co.*, 641 N.E.2d 861, 864 (Ill. App. 1994)); *see also* 3 *Williston on Contracts* § 7:7 (4th ed. 2017) ("Where an illusory promise is made, that is, a promise merely in form, but in actuality not promising anything, it cannot serve as consideration."). For an insurance policy to be illusory, the insurer's promise, construing the policy as a whole, must be "empty" or "optional." *W.E. Erickson*, 641 N.E.2d at 864; *see also Sears, Roebuck & Co. v. Reliance Ins. Co.*, 654 F.2d 494, 499 (7th Cir. 1981) ("But if this exclusion is construed as Commercial suggests, there would never be any coverage for Sears … . The law cannot countenance such illusory 'coverage.'"); *Aetna Cas. & Sur. Co. v. O'Rourke Bros.*, 776 N.E.2d 588, 598 (Ill. App. 2002) ("[A]llowing Aetna to apply the retained limit to each and every settlement by every plaintiff would, in effect, deny O'Rourke all coverage and make Aetna's … policy coverage illusory."); *Empl'rs' Fire Ins. Co. v. Berg*, 2007 WL 273559, at *4 (N.D. Ill. Jan. 25, 2007) ("Illusory coverage means that the policy, when read as a whole, provides no coverage at all.") (citing *W.E. Erickson*, 641 N.E.2d 861); *Murray Ohio Mfg. Co. v. Cont'l Ins. Co.*, 705 F. Supp. 442, 444 (N.D. Ill. 1989) ("The small print cannot 'taketh away' one hundred percent of what the large print 'giveth.'"). A policy provision that would render coverage under the policy truly illusory may not be enforced. *See O'Rourke Bros.*, 776 N.E.2d at 598; *Archer Daniels Midland Co. v. Burlington Ins. Co. Grp.*, 785 F. Supp. 2d 722, 735 (N.D. Ill. 2011); *Murray Ohio Mfg.*, 705 F. Supp. at 444; 3 *Williston on Contracts* § 7:7.

**A.** **Regardless of whether Waukegan could satisfy the nose coverage's conditions precedent, the States Policy is not illusory because they do not apply to the policy period coverage.**

The States Policy is not illusory because States's obligations thereunder are neither empty nor optional. Examining the Prior Acts Endorsement's text shows that the conditions precedent apply only to the nose coverage, not to coverage for the policy period. The Prior Acts Endorsement provides for coverage where:

> the bodily injury or property damage [or personal injury or wrongful act] is first sustained [or committed] during the policy period in the coverage territory *or*; the bodily injury or property damage [or personal injury or wrongful act] is first sustained [or committed] in the coverage territory during 22 years prior to the inception date shown in the Declarations of this policy *and*; [the five conditions precedent are met].

Doc. 11-2 at 33-34 (emphasis added). The word "or" and the following semicolon set off the first part of the passage—providing coverage during the "policy period"—as a separate and independent provision not subject to the conditions precedent, which apply only to the coverage set forth after the semicolon, the nose coverage.

The Appellate Court of Illinois reached the same conclusion under analogous circumstances in *Smith v. Neumann*, 682 N.E.2d 1245 (Ill. App. 1997). The policy in *Smith* set forth two coverage alternatives, in subsections (aa) and (bb), with the insurer agreeing to:

> pay on behalf of the Insured all sums in excess of the Deductible amount … which the Insured shall become legally obligated to pay as damages … by reason of any act, error or omission in professional services rendered or that should have been rendered by the insured[,] PROVIDED ALWAYS THAT such act, error or omission or such Personal Injury happens:
>
> aa. *during the policy period*, *or* bb. *prior to the policy period provided that*, prior to the effective date of this policy: 1. the Insured did not give notice to any prior insurer of any such act, error, omission or Personal Injury, and 2. the Insured did not have a basis to believe that the act, error or omission or Personal Injury was a breach of professional duty or may result in a claim, and 3. there is no prior policy or policies which provide insurance for such liability or claim … .

682 N.E.2d at 1248 (emphasis added).  As in the States Policy, the disjunctive "or" set off the policy period coverage (in subsection (aa)) from the prior period coverage (in subsection (bb)), and the conditions precedent were set forth after the prior period coverage language.  Given this sequence, *Smith* held that the conditions precedent applied only to the prior period coverage.  As the court explained, the policy "sets forth two different principles for determining when the coverage is available … .  No limitation on coverage is listed when a negligent act occurs during [the policy] period.  However, when the negligent act occurs prior to the effective date of the policy period, coverage [pursuant to the condition precedent in subsection (bb)(3)] extends only when no other policy can provide coverage."  *Id*. at 1251.  The same holds true under the materially identical policy language here.

Even putting aside *Smith*, the Prior Acts Endorsement's first, third, fourth, and fifth conditions precedent presuppose that the insured seeks coverage for an event that predates the policy period, which necessarily means that they cannot sensibly be read to apply to a claim made during the policy period.  Consider the first condition precedent, which provides "that the *named insured* had no knowledge at the inception of this policy of the [bodily injury, property damage, personal injury, or wrongful act] or could not have reasonably foreseen that the [bodily injury, property damage, personal injury, or wrongful act] might give rise to a *claim*."  Doc. 11-2 at 33-34.  Knowing or reasonably foreseeing at the inception of the States Policy that some event qualified as bodily injury, property damage, personal injury, or wrongful act requires that the event have taken place before the States Policy came into effect.

The third condition likewise makes sense only if it applies to events occurring before the policy's effective date.  That condition provides that "the policy providing coverage for [bodily injury, property damage, personal injury, or a wrongful act] immediately preceding this policy

was claims-made, not occurrence, coverage." *Ibid*. For a claim made during the policy period, it would not matter what kind of insurance Waukegan had in place before the States Policy came into effect. For the nose coverage, however, it would matter a great deal. Nose coverage exists to indemnify an insured for an event that occurred in the past, but for which the deadline to file a claim has already passed. For that reason, an insured needs nose coverage only when its previous insurance is claims-based; occurrence-based coverage, by definition, does not impose filing deadlines, so long as the event giving rise to the claim took place during the coverage period. *See Ernie Haire Ford, Inc. v. Universal Underwriters Ins. Co.*, 541 F. Supp. 2d 1295, 1302 n.9 (M.D. Fla. 2008) (nose coverage is "designed to provide an insured—during an initial policy period when the insured is changing from claims-made to occurrence-type coverage— with coverage for prior acts"). The third condition precedent thus sensibly applies only to the nose coverage, not to the policy period coverage.

The same holds true for the fourth and fifth conditions precedent. As to the fourth— which provides that "the *insured* had public entity general liability insurance [or public entity management practices liability insurance] in effect during the five years prior to the inception of this policy," Doc. 11-2 at 33-34—the insured's previous insurance would not be relevant to a claim filed during the policy period. And as to the fifth—which provides that "no claim was made seeking *damages* for [or as a result of the bodily injury, property damage, personal injury, or wrongful act]," *ibid*.—a claim could have been filed prior to the inception of the States Policy only if the event underlying it also took place before the policy came into effect.

The bottom line, then, is that the States Policy obligates States to indemnify Waukegan for any bodily injury, property damage, personal injury, or wrongful act committed or sustained during the policy period in the coverage territory regardless of whether the Prior Acts

Endorsement's conditions precedent were all satisfied. In turn, because "*the policy*, when read as a whole," is not illusory, *Berg*, 2007 WL 273559, at *4 (emphasis added), it does not matter under Illinois law whether Waukegan's inability to satisfy the Prior Acts Endorsement's third condition precedent makes *the nose coverage* illusory. *Berg* illustrates the point. In that case, an uninsured motorist injured the president of a company while he was working approximately fifteen feet away from the company-owned car he had driven to a job site. *Id.* at *2. The president sought to recover under the car's uninsured motorist coverage, which defined the term "insured" to mean: "1. You[.] 2. If you are an individual, any 'family member.' 3. Anyone else 'occupying' a covered 'auto' or a temporary substitute for a covered 'auto.' … 4. Anyone for damages he or she is entitled to recover because of 'bodily injury' sustained by another 'insured.'" *Ibid.* The president argued that, to avoid rendering illusory the coverage, the term "You" had to include the company's "employees and agents." *Id.* at *4. In rejecting that argument and agreeing with the insurer's contention that the term "You" applied only "to the corporation itself," *Berg* explained that even though the term did not include the company's employees and agents, the term "Anyone else 'occupying' a covered 'auto'" could. *Ibid.* Thus, although one part of the definition of "insured" covered no person or entity—corporations, after all, cannot drive cars—that did not render illusory the whole provision. *Ibid.*

So, too, here. Because the States Policy provides coverage for events occurring during the policy period, the policy is not illusory, regardless of whether the nose coverage, viewed in isolation, offers an effectively empty promise. *See W.E. Erickson*, 641 N.E.2d at 864 (holding that a policy is not illusory if it "clearly covers losses" in at least some circumstances); *Polzin v. Phoenix of Hartford Ins. Cos.*, 283 N.E.2d 324, 328 (Ill. App. 1972) (same result as *Berg* on

comparable facts); *Berg*, 2007 WL 273559, at *4 (citing *W.E. Erickson* in holding that "[o]nly where there is no possibility under any set of facts for coverage is the policy deemed illusory").

**B.**    **Even if the States Policy as a whole would be illusory if the nose coverage were illusory, and even if Waukegan could not satisfy the third condition precedent, States's promise to provide nose coverage was not illusory.**

Even if analysis of whether the States Policy is illusory turned on the nose coverage in isolation as opposed to the policy as a whole, Waukegan's argument still would fail under the analysis set forth in *W.E. Erickson*.  The insured in that suit sued its title insurer after learning that the federal government held title to property that the insured believed, based on the insurer's title commitment, it had rightfully purchased.  641 N.E.2d at 862-63.  The title insurance policy, however, provided that the insurer would be liable "only for actual loss incurred in reliance" on the commitment.  *Id*. at 863.  That posed a problem "because [the insured] acquired whatever interest it had in the property before acquiring the title commitment."  *Id*. at 864.  Accordingly, the insured "could not have relied on the commitment" in acquiring that property interest, meaning the policy did not provide coverage in the circumstances presented there.  *Ibid.*

As Waukegan does here, the insured argued that because it "paid a premium to [the insurer] in return for nothing," the policy was illusory.  *Ibid*.  The court disagreed, explaining that, because "[t]he commitment only excludes recovery for damages caused by a defect in title if the insured did not *rely* on the commitment to acquire the title," the policy covered "losses suffered by an insured who relies on the commitment."  *Ibid*.  As a result, the title insurer's "promise [was] not illusory, but contingent upon the loss occurring after the insurance takes effect."  *Ibid*.  As the court explained, "[t]hat [the insured] could never show such losses resulting from reliance, does not negate the promise of the title company to reimburse were [the insured] able to do so."  *Ibid*.  Several post-*W.E. Erickson* decisions reach the same result on

comparable facts. *See Am. Country Ins. Co. v. Kraemer Bros.*, Inc., 699 N.E.2d 1056, 1062 (Ill. App. 1998) (holding that a policy was not illusory because it provided "real coverage for strict liability claims," even if it was relatively unlikely that such claims could be brought against a general contractor like the insured); *Archer Daniels Midland*, 785 F. Supp. 2d at 735 (citing *W.E. Erickson* and holding that an exclusion did not render the policy illusory under Illinois law because it "does not preclude any possibility of coverage under other facts"); *Century Sur. Co. v. John B., Inc.*, 2006 WL 140551, at *7 (N.D. Ill. Jan. 17, 2006) (citing *W.E. Erickson* and holding that the policy was not illusory under Illinois law because it "covers some injuries resulting from certain factual situations," even though those factual situations were not presented in the case).

      *W.E. Erickson* and its progeny teach that the fact that a *particular* insured may be unable to satisfy a condition precedent does not make the policy illusory, provided that the condition could be satisfied under other realistic factual circumstances. *See W.E. Erickson*, 641 N.E.2d at 864 ("Had [the insured] relied on the commitment in its acquisition of the Crestwood property only to discover that the federal government owned the property, [the insured] would be entitled to damages. It is also undisputed that the chronology of this case makes such reliance an impossibility."). For that reason, even if analysis of whether the States Policy is illusory rested solely on the nose coverage and not on the policy period coverage, Waukegan's inability to satisfy the third condition precedent because it had occurrence- rather than claims-based coverage under the Indian Harbor Policy immediately prior to obtaining coverage under the States Policy does not make the States Policy illusory. As in *W.E. Erickson*, the fact that the applicable contingency did not—and could not—materialize under the present circumstances does not "negate the promise" of coverage were the contingency to be met, as in the counterfactual where Waukegan previously had claims-based coverage. *Ibid.*; *see also John B.*,

2006 WL 140551, at *7 (explaining that if the insureds "had wanted coverage for the situations excluded by [their] policy, they should have paid for them in this policy, or alternatively, sought coverage for the types of claims at issue elsewhere").

This is particularly so given that the third condition precedent's language is clear, unambiguous, and exceptionally simple. As noted, the condition states that "the policy providing coverage for [bodily injury or property damage or personal injury or a wrongful act] immediately preceding this policy was claims-made, not occurrence, coverage." Doc. 11-2 at 33-34. The term "policy … immediately preceding this policy" is not difficult to decipher, particularly for a sophisticated party like Waukegan. Given that this term undoubtedly was clear to Waukegan from the outset, Waukegan knew what it was getting into. Its dissatisfaction with the coverage it purchased does not render it illusory. *See Archer Daniels Midland*, 785 F. Supp. 2d at 735-36 (holding that a policy was not unenforceable as illusory where "the exclusion is plain and clear and does not surreptitiously take away the coverage that the [relevant endorsement] or other policy provisions purport to grant"); *John B.*, 2006 WL 140551 at *7 (noting that the policy was not illusory in part because the "the exclusionary language is clear and straightforward").

Waukegan argues in the alternative that construing the policy in States's favor would violate Illinois law by privileging the interpretation of the "party in control of the agreement and for whose benefit the condition precedent runs." Doc. 61 at 8. According to Waukegan, it was States's responsibility to draft a set of conditions that could be satisfied. *Ibid.*; Doc. 63 at 10. But Waukegan itself certainly knew what kind of insurance—claims-based or occurrence-based—it had in place immediately prior to the States Policy's effective date. Because compliance with the third condition precedent was in Waukegan's control, this situation is materially different from that presented in *Grill v. Adams*, 463 N.E.2d 896, 900 (Ill. App. 1984),

where the defendants "attempt[ed] to use their own non-compliance with a condition, inserted into the contract for their benefit, as the justification for concluding that the parties' contractual duties never ripened."  Accordingly, the principle announced in *Grill* that Waukegan invokes here—"[a] party cannot take advantage of his own conduct and claim that failure of the fulfillment of a condition therefore defeats his liability," *ibid*.—is inapplicable.

Nor does the rule requiring that ambiguous policy provisions be construed against the insurer apply here.  The third condition precedent's text is unambiguous, plainly requiring that Waukegan have previously had in place claims-based coverage in order to trigger nose coverage under the States Policy.  *See Outboard Marine Corp. v. Liberty Mut. Ins. Co.*, 607 N.E.2d 1204, 1217 (Ill. 1992) ("If the terms in the policy are clear and unambiguous, the court must give them their plain, ordinary, popular meaning. … Ambiguous terms [by contrast] are construed strictly against the drafter of the policy and in favor of coverage.").  Moreover, the ordinary information asymmetries between parties that motivate the rule do not apply here.  *See Smith v. Allstate Ins. Co.*, 726 N.E.2d 1, 7 (Ill. App. 1999), *opinion modified on denial of reh'g* (Mar. 17, 2000) ("'Where one party chooses the terms of a contract, he is more likely than the other party to have reason to know of uncertainties of meaning.  Indeed, he may deliberately obscure, intending to decide at a later date what meaning to assert.'") (alterations omitted) (quoting Restatement (Second) of Contracts, § 206, cmt. a (1981)).  Waukegan, not States, was best positioned to know whether the Prior Acts Endorsement applied to Waukegan's particular circumstances.  *See Brandt v. Time Ins. Co.*, 704 N.E.2d 843, 846 (Ill. App. 1998) ("Illinois law imposes no duty on an insurer to conduct an independent investigation of insurability.").

Waukegan advances another alternative argument—that it *could* satisfy the third condition precedent because part of its previous coverage, the Indian Harbor Policy's Public

Officials and Employment Practices Liability Coverage, was claims-based.  Doc. 50 at 14; Doc.

61 at 14.  That argument defeats Waukegan's central point, for if Waukegan were right that there

is a factual scenario under which it could satisfy the third condition, then the States Policy could

not possibly be illusory.  *See W.E. Erickson*, 641 N.E.2d at 864; *Archer Daniels Midland*, 785 F.

Supp. 2d at 735; *John B.*, 2006 WL 140551, at *7.

The foregoing analysis applies with equal force to Waukegan's argument that it could

never satisfy the Prior Acts Endorsement's second condition precedent because Waukegan's

"self-insured retention" would apply to any claim it might file under the States Policy.  Doc. 61

at 5.  As noted, the second condition precedent requires that "there is no insurance or other

indemnity agreement that applies, in whole or in part, to the *claim* arising from" the asserted

bodily injury, property damage, personal injury, or wrongful act.  Doc. 11-2 at 33-34.  Even

assuming that Waukegan were correct that its self-insured retention constitutes "other insurance"

that would always apply to any claim, Doc. 61 at 5, that would not, for the reasons set forth as to

the third condition precedent, render illusory the States Policy.  After all, not every insured has a

self-insured retention.

In sum, neither the second nor third conditions precedent renders illusory the States

Policy.  It follows that the conditions precedent may be enforced.

## II.     Because The Lloyd's Policy Applies to the *Gonzalez* Suit, the Second Condition Precedent Is Not Satisfied, Thereby Defeating Nose Coverage Under the States Policy's Prior Acts Endorsement.

The remaining question is whether States is right that its policy does not cover the

*Gonzalez* suit because Waukegan fails to satisfy the second condition precedent of the States

Policy's Prior Acts Endorsement—in other words, because the Lloyd's Policy "applies, in whole

or in part, to the *claim* arising from" *Gonzalez*.  Doc. 11-2 at 33-34.  Given its unambiguous

language, the Lloyd's Policy's Law Enforcement Liability provision applies to *Gonzalez*, which

means that the second condition precedent is not satisfied, which in turn means that *Gonzalez* does not trigger the States Policy's nose coverage. *See Keystone Consol. Indus., Inc. v. Emps. Ins. Co. of Wausau*, 456 F.3d 758, 762 (7th Cir. 2006) ("[T]he next logical question is what is required to trigger an insurer's duty to indemnify. The answer to that question is found in the language of the policies. Under Illinois law, construction of insurance policies is a question of law.").

As noted, the Lloyd's Policy's Law Enforcement Liability provision provided coverage for any occurrence "during the period of this insurance" for "all sums which the Assured shall be obligated to pay by reason of errors, omissions or negligent acts *arising out of* the performance of the Assured's duties while acting as a law enforcement official." Doc. 48-1 at 19 (emphasis added). The term "Assured" includes both Waukegan and its employees. *Id*. at 11 (providing that "Assured" includes "not only the Named Assured but also … any official, trustee, Director, Officer, Partner, Volunteer or employee of the Named Assured while acting within the scope of his duties as such"). And the term "Personal Injury" includes "Bodily Injury," "Malicious Prosecution," and "Discrimination," as well as, but only for purposes of the Law Enforcement Liability Provision, "False Arrest, False Imprisonment, Detention and Violation of Civil Rights arising out of Law Enforcement Activities," while the term "Bodily Injury" includes both "physical injury to any person" and related "mental anguish or mental suffering." *Id*. at 19-20.

Waukegan concedes that the Lloyd's Policy applies to at least some of Gonzalez's claims—specifically, to his malicious prosecution claims against the individual officers. Doc. 50 at 13-14. But, Waukegan contends, the policy's Law Enforcement Liability provision does not encompass "Gonzalez's … pattern and practice claims, which constitute separate and discrete claims against the City of Waukegan" under *Monell v. Department of Social Services*, 436 U.S.

658 (1987). *Ibid.* Instead, Waukegan continues, Gonzalez's *Monell* claims are covered under a different part of the Lloyd's Policy—the Errors and Omissions provision—which, Waukegan argues, was issued on a claims-made basis, unlike the Law Enforcement Liability provision, which was issued on an occurrence basis. *Ibid.*; *see* Doc. 48-1 at 19, 26-27. And because Waukegan did not file a claim under the Errors and Omissions provision before the Lloyd's Policy expired, it concludes that the States Policy's Prior Acts Endorsement's second condition precedent is satisfied, insofar as there is no other policy that applies, either in whole or in part, to Gonzalez's *Monell* claims against the City. Doc. 50 at 13-14. This is mistaken for two reasons.

First, the Lloyd's Policy's occurrence-based Law Enforcement Liability provision— which provides coverage for "all sums which the Assured shall be obligated to pay by reason of errors, omissions or negligent acts *arising out of* the performance of the Assured's duties while acting as a law enforcement official," Doc. 48-1 at 19 (emphasis added)—and not the claims-based Errors and Omissions provision, applies to Gonzalez's *Monell* claims. Under Illinois law, the term "arising out of" in an insurance policy is synonymous with but-for causation—it means "'originating from,' 'having its origin in,' 'growing out of,' and 'flowing from.'" *Shell Oil Co. v. AC&S, Inc.*, 649 N.E.2d 946, 951-52 (Ill. App. 1995) (quoting *Md. Cas. Co. v. Chi. & N.W. Transp. Co.*, 466 N.E.2d 1091, 1094 (Ill. App. 1984)); *see also State Auto. Mut. Ins. Co. v. Kingsport Dev., LLC*, 846 N.E.2d 974, 982 (Ill. App. 2006) (applying *Shell Oil*); *Am. States Ins. Co. v. Liberty Mut. Ins. Co.*, 683 N.E.2d 510, 513 (Ill. App. 1997) (same); *Great W. Cas. Co. v. Marathon Oil Co.*, 2001 WL 103426, at *4 (N.D. Ill. Jan. 31, 2001) (same). Gonzalez alleges that the City is liable under *Monell* (and also under state law) for the officers' unlawful acts in investigating and prosecuting him, including their fabricating and withholding evidence, fabricating and coercing confessions, filing false police reports, and committing perjury—all of

which, Gonzalez alleges, caused him injury.  Doc. 11-1 at ¶¶ 115-118 (*Monell* claim); 134-136

(state law claim).  Thus, any damages that the City would be ordered to pay in *Gonzalez*

originated, grew out of, or flowed from the performance of its employees' duties while acting as

law enforcement officials.  *See Am. Safety Cas. Ins. Co. v. City of Waukegan*, 776 F. Supp. 2d

670, 711 (N.D. Ill. 2011) ("To begin, the Underwriters/Northfield policies contemplated

coverage for the types of injuries alleged in the Dominguez Civil Case.  The 'law enforcement

liability' section of the policy states that the insurers will 'indemnify the Assured for all sums

which the Assured shall be obligated to pay by reason of errors, omissions, or negligent acts

arising out of the performance of the Assured's duties while acting as a law enforcement official

or officer in the regular course of public employment … arising out of any occurrence from any

cause on account of Personal Injury … .'  This provision makes clear that the policy covers

injuries like Dominguez's for false arrest and malicious prosecution arising out of the police

duties of Waukegan police officers.") (alterations in original), *aff'd*, 678 F.3d 475 (7th Cir.

2012).

Given all this, the second condition precedent is not satisfied.  Because the acts at issue in

*Gonzalez* indisputably occurred while the Lloyd's Policy was in effect, the City *could* have filed

a claim under that policy's occurrence-based Law Enforcement Liability provision.  As a result,

the City could *not* have filed a claim under that policy's claims-based Errors and Omissions

provision, which states that it "shall not apply to any Claims made against the Assured … arising

out of law enforcement activities" and "does not apply to any claim for damages, whether direct

or consequential, or for any cause of action which is covered under any other Section of this

Policy."  Doc. 48-1 at 27.

Second, even if only Gonzalez's claims against the individual defendants and not his *Monell* claims against the City were covered by the Lloyd's Policy's Law Enforcement Liability Provision, it would not matter. As noted, under the second condition precedent, the States Policy's nose coverage is triggered only where "there is no insurance or other indemnity agreement that applies, in whole or in part, to the *claim* arising from" the relevant bodily injury, property damage, personal injury, or wrongful act. Doc. 11-2 at 33-34. The States Policy further defines the term "claim" to mean either "a demand for *damages*" or "a civil proceeding seeking *damages*," with "damages" defined as a "monetary amount paid to compensate … for an injury or loss covered by this policy" and including both pre- and post-judgment interest and attorney fees. *Id*. at 21-22. Applying that definition to *Gonzalez* yields the conclusion that the suit, even though it names multiple defendants and asserts multiple causes of action, constitutes a single claim because Gonzalez's complaint makes a single demand for damages. Doc. 11-1 at 27 ("Wherefore, Angel Gonzalez prays as follows: A. That the court award compensatory damages to Plaintiff and against all Defendants, jointly and severally, in an amount to be determined at trial."); *see Bancorpsouth, Inc., v. Fed. Ins. Co.*, 873 F.3d 582, 587 (7th Cir. 2017) (construing under Mississippi law the same definition of "claim" in an insurance policy, and concluding that, insofar as the underlying complaint had a single "gravamen," courts should not "uncouple allegations, read them in isolation, and disregard their context"); *cf. NAACP v. Am. Family Mut. Ins. Co.*, 978 F.2d 287, 292 (7th Cir. 1992) (in construing the term "claim" under Civil Rule 54(b), explaining that "different legal theories … do not multiply the number of claims for relief" because "[o]ne set of facts producing one injury creates one claim for relief, no matter how many laws the deeds violate"). As a result, even if only Gonzalez's malicious prosecution cause of action against the individual defendants were covered under the Lloyd's Policy's occurrence-

based Law Enforcement Liability provision, the States Policy's Prior Acts Endorsement's second condition precedent would remain unsatisfied because there is at least one other policy that applies to the claim Gonzalez asserts.

For his part, Gonzalez contends that the question whether the Lloyd's Policy applies to *Gonzalez* cannot be adjudicated at the pleading stage because the term "applies" in the States Policy's Prior Acts Endorsement's second condition precedent is ambiguous. Doc. 59 at 6. In support, Gonzalez cites *Fontana Builders, Inc. v. Assurance Co. of America*, 882 N.W.2d 398, 403 (Wis. 2016). The policy in *Fontana* excluded coverage "when permanent property insurance applies," and the Supreme Court of Wisconsin held that the term "applies" was ambiguous under Wisconsin law because it was not clear "[t]o whom or to what must permanent property insurance apply for coverage to end." *Id*. at 412. *Fontana* may be right as far as it goes, but it is inapposite here because there is no such ambiguity in the States Policy. The States Policy's Prior Acts Endorsement is triggered where "there is no insurance or other indemnity agreement that applies, in whole or in part, *to the claim arising from*" the relevant bodily injury, property damage, personal injury, or wrongful act. Doc. 11-2 at 33-34 (emphasis added). Thus, unlike the policy in *Fontana*, the term "applies" in the States Policy is not ambiguous on the ground that it lacks a grammatical object; to the contrary, the "insurance … that applies" must apply "to the claim arising from" the relevant bodily injury, property damage, personal injury, or wrongful act—here, Gonzalez's arrest, detention, and prosecution, and his subsequent suit for damages.

Gonzalez next argues that the term "applies" is ambiguous because it could mean either that the Lloyd's Policy "potentially applies" or that it "actually applies" to *Gonzalez*. Doc. 59 at 8-9. In support, Gonzalez cites *In re Deepwater Horizon*, 807 F.3d 689 (5th Cir. 2015). Like the

States Policy's Prior Acts Endorsement, the policy in *Deepwater Horizon* provided that "'[i]f other insurance applies to a 'loss' that is also covered by this policy, this policy will apply excess of such other insurance.'" 807 F.3d at 694. But that policy was "primary insurance," not nose coverage. *Id*. at 695. And the "other insurer" (the party in the position held by Lloyd's here) in *Deepwater Horizon* "refused [the insured's] demands for indemnification." *Id*. at 694. Accordingly, the Fifth Circuit reasoned that construing the "other" policy as though it applied to the loss put the insured in a worse position than if it had not "chose[n] to maintain a potential alternative source of protection for its loss—something [the primary insurer] did not require it to do," as the insured would now "have to litigate with that alternative source before recovering anything" under its primary insurance. *Id*. at 695.

There is no such tension here. Construing the Lloyd's Policy to apply to the *Gonzalez* suit does not make Waukegan any worse off because it has already received a payout under the Lloyd's Policy comprising "the full limits of [Lloyd's and Northfield's] liability under" that policy. Doc. 59-1 at 6, 13. By the same token, Waukegan is not deprived of the benefit of the nose coverage it purchased from States, which is designed to hedge against the risk that Waukegan would lack coverage for acts outside the coverage period as it transitioned from claims-based to occurrence-based coverage. *See Ernie Haire Ford*, 541 F. Supp. 2d at 1302 n.9 (noting that nose coverage is "designed to provide an insured—during an initial policy period when the insured is changing from claims-made to occurrence-type coverage—with coverage for prior acts").

Gonzalez finally contends that because Lloyd's disputes that its policy applies to the *Gonzalez* suit, that question cannot be decided on the pleadings. Doc. 59 at 9-10. The trouble with Gonzalez's contention is that the second condition precedent of the States Policy's nose

coverage is not ambiguous, which means that Lloyd's view of its policy with Waukegan—whatever it may be—does not bear on how to construe relevant provisions of either the States Policy or the Lloyd's Policy.  *See Cannon v. Burge*, 752 F.3d 1079, 1088 (7th Cir. 2014) (holding that, under Illinois law, "[w]here a written agreement is clear and explicit, a court must enforce the agreement as written.  Both the meaning of the instrument, and the intention of the parties must be gathered from the face of the document without the assistance of parol evidence or any other extrinsic aids.") (quoting *Rakowski v. Lucente*, 472 N.E.2d 791, 794 (Ill. 1984)); *People ex rel. Dep't of Pub. Health v. Wiley*, 843 N.E.2d 259, 268 (Ill. 2006) ("The intention of the parties to contract must be determined from the instrument itself, and construction of the instrument where no ambiguity exists is a matter of law.") (citation omitted).  Gonzalez is similarly mistaken in contending that the fact that Lloyd's has already settled its claims with Waukegan means that the Lloyd's Policy no longer "applies" (in the present tense) to the *Gonzalez* suit.  Doc. 59 at 13-14.  For the reasons just given, Lloyd's decision to enter into the Risk Management Agreement with Waukegan cannot inform the meaning of the Lloyd's Policy.

## Conclusion

For the foregoing reasons, States is awarded judgment on the pleadings.  The States Policy does not require States to defend or indemnify Waukegan in the *Gonzalez* suit.  Judgment will be entered in favor of States and against Waukegan and Gonzalez.

March 16, 2018

_____
United States District Judge